## LESTER L. ROBINSON and others *vs.* EDWARD P. FLINT and others.

The defendants agreed to send to the plaintiffs, at San Francisco, "all the balance of the iron for said railroad, now lying in Boston or New York, amounting to about fifteen hundred tons, which said iron was originally purchased by C. L. W. from W. F. W. & Co., of Boston." *Held* that this language was simply descriptive, and did not constitute a warranty that the particular article existed. And that if the article was not at the places from which the defendants were to transport it, the omission to send it would be no breach on their part.

The very gist of the action for deceit is the fraudulent intent with which the representation is made; and that intent is not established by proof merely of the falsity of the representation; but knowledge, when it was made, by the party making it, that it was false, must be shown.

Where all the information possessed by the party making a representation was obtained from others, and there was nothing to show that he did not believe, or had not the right to believe, in the truthfulness of the information he had received; *Held* that no action would lie against him to recover damages for false representations.

THIS case comes before the court upon exceptions ordered to be heard in the first instance at the general term; the plaintiffs having been nonsuited at the trial. The suit is upon two separate claims or causes of action, both arising out of the same general transaction. The first claim is to recover damages for false representations, fraud and deceit, respecting certain railroad iron; the second claim is to recover damages of the defendants for not sending to the plaintiffs at San Francisco, certain rail-

road iron purchased by the plaintiffs of the defendants, but
sending instead, iron of an inferior character and quality.
The plaintiffs alleged, in their complaint, that they, at the
times thereinafter specified, were copartners, trading and
doing business under the firm name of Robinson, Seymour
& Co. That the defendants, Edward P. Flint, James P.
Flint, Alfred Peabody, and George H. Kellogg, at the
times thereinafter specified, were, and still are, copartners,
trading and doing business under the firm name of Flint,
Peabody & Co., at Boston, San Francisco, and elsewhere.
That the defendants, William T. Gliddon, John A. Glid-
don, and J. M. S. Williams, at the times thereinafter speci-
fied, were, and still are, copartners, trading and doing busi-
ness under the firm name of Gliddon & Williams, at Boston
and elsewhere. That on or about March 10, 1854, Thomp-
son & Forman, of London, by their agents, William F. Weld
& Co., of Boston, made and entered into a certain con-
tract or agreement with the Sacramento Valley Railroad
Company, by their president and agent, Charles L. Wil-
son, for the sale and delivery to said railroad company of
two thousand tons of railroad iron, the rails to be manu-
factured by said Thompson & Forman, or by manufac-
turers of equal celebrity, and to be of their best quality, to
be made like two patterns then agreed upon and delivered,
and the price thereof to be $48 per ton of 2240 pounds,
free on board in Wales, (in Great Britain,) and to be
equal to cash at dates of the bills of lading given in Wales.
The iron was to be shipped from Wales to California by
the way of Boston, and W. F. Weld & Co. agreed to ad-
vance the money for the freight and insurance, the same
to be repaid by the railroad company, with interest and
commissions. In payment for the iron, the railroad com-
pany were to give their notes, payable six months after
date of arrival of each shipment at San Francisco, with in-
terest from date of each shipment at Wales, the notes to
be secured by the indorsements of any number of the

directors of the railroad company, or such other collateral security as might be required by said Flint, Peabody & Co., at San Francisco, who, together with said Gliddon & Williams, it was in said contract mentioned, guarantied the performance of this contract by the railroad company, for a commission to be paid them by said company, the notes to be paid at maturity, in sight bills on Boston, or an equivalent in cash, the company to pay all freight, duties and charges on the iron, which might accrue after leaving Wales. At the time of making the contract last mentioned, and on or about the 10th of March, 1854, the defendants Gliddon & Williams, and Flint, Peabody & Co., for a valuable consideration, made, executed and delivered to said William F. Weld & Co., agents of Thompson & Forman, a certain instrument in writing, whereby they guarantied the full performance on the part of said railroad company, of all and each of its stipulations in said above mentioned contract, and which was thereto annexed, to as full an extent as if said defendants were the sole purchasers of the said iron. On or about the 17th of March, 1854, and shortly after the execution and delivery of the contracts above mentioned, said defendants Gliddon & Williams, and Flint, Peabody & Co., jointly, of the one part, and said Charles L. Wilson, on behalf of himself and also as president and agent of said railroad company, of the other part, entered into an agreement, by which, after reciting and referring to the contracts above mentioned, it was agreed that Gliddon & Williams should receive the iron from W. F. Weld & Co., and ship it in vessels of their line to San Francisco, consigned to Flint, Peabody & Co., in certain quantities, and at a rate of freight therein specified. Three hundred to five hundred tons were to be shipped immediately, or as soon as furnished by Weld & Co., and the balance of the two thousand tons, when the defendants should have the individual responsibility of each one of the directors of the road for the performance

Robinson *v.* Flint.

of all Mr. Wilson's contracts respecting this lot of iron, or the names of so many directors as should be fully satisfactory to Flint, Peabody & Co. If Wilson failed to obtain this security, then Weld & Co., Gliddon & Williams, and Flint, Peabody & Co., were not under obligations to him to make further arrangements. The defendants, said firms, were to receive for their joint equal benefit, from Wilson and the railroad company, a commission of five per cent on the gross cost of the iron delivered in San Francisco, (exclusive of the cost of freight thence from Boston,) which was to be in full for their services as guarantors, &c. As a large part of this iron was to be received from England, (meaning Wales,) no definite period could be fixed for its shipment from Boston; but if possible it was all to be on the way from Boston to California by the 15th of June, 1854. Soon after the making of said contracts, and in pursuance thereof, the whole of said two thousand tons of iron was imported into the United States, and, under the last mentioned agreement, the defendants Gliddon & Williams, did, in or about the months of May, June and July, 1854, ship to San Francisco, consigned to the defendants Flint, Peabody & Co., about four hundred and ninety-one tons of said railroad iron, and the same arrived there at different dates, between the 9th of September and the 20th of November, 1854. On the 24th day of November, 1854, at said city of San Francisco, the plaintiffs made and entered into an agreement in writing, with said Sacramento Valley Railroad Company, whereby the plaintiffs agreed to construct and equip the entire road of said company within eighteen months thereafter, for the price or sum of $1,800,000. And also therein agreed to assume the said contract made, for two thousand tons of iron rails, with William F. Weld & Co., of Boston, as agents of Thompson & Forman of London, dated March 10th, 1854; provided, however, that no reference should be had or no responsibility assumed upon said contract, unless it could

be carried out as originally contemplated; and provided said Flint, Peabody & Co. would not require the individual indorsement of any member of the board of directors of said company on the notes to be given for the iron. Soon after making the last mentioned contract, and in January, 1855, the plaintiffs went to Boston for the purpose of ascertaining the market price of such railroad iron as is above mentioned, and whether the defendants were in a condition to carry out the aforesaid contract for the purchase of iron as originally contemplated, so that the plaintiffs would be bound by their said contract with the railroad company to take that particular iron, although the contract price and charges greatly exceeded the then market value of said iron in Boston; and the plaintiffs then ascertained that such iron as was agreed for in the original contract of purchase, could then be bought in Boston at the price of $45 per ton of two thousand two hundred and forty pounds, free and clear of all charges except the duties payable to the government; whereas the iron, according to the original contract of purchase, was to be paid for at the rate of $48 per ton, with the addition not only of duties but of freight, insurance and all other charges from the time of its shipment in Wales, making a difference between the contract price, with the charges on the iron and the market value of such iron in Boston, of about $32 per ton of two thousand two hundred and forty pounds. The plaintiffs thereupon, in the same month of January, 1855, applied to the defendants Gliddon· & Williams, and Flint, Peabody & Co., for the purpose of ascertaining whether the iron originally purchased by the railroad company was still on hand in Boston, and the defendants could carry out the contract for the purchase of iron as originally contemplated, so that the plaintiffs would be bound by their said contract with the railroad company to accept said iron under and in pursuance of the original contract of sale. The plaintiffs thereupon

Robinson *v.* Flint.

stated that they had made such contract as aforesaid with the railroad company, and were bound to carry out the original contract of purchase, provided the iron originally purchased and imported was still on hand in Boston, and the defendants could carry out the contract as originally contemplated, but not otherwise; and the plaintiffs also stated to the defendants that the plaintiffs were ready to carry out the original contract of purchase, provided the iron was still on hand, as aforesaid, and the defendants could carry out the contract of purchase as originally contemplated; and provided also that the defendants Flint, Peabody & Co. would not require the individual indorsement of any member of the board of directors of the railroad company on the notes to be given for the iron. Thereupon, the defendants Gliddon & Williams, and Flint, Peabody & Co., well knowing all and singular the premises aforesaid, and contriving and fraudulently intending to cheat and defraud the plaintiffs by inducing them to enter into the contract hereinafter mentioned, for the iron, at a price greatly exceeding its market value, falsely, fraudulently and deceitfully stated and represented to the plaintiffs that the identical iron imported under the original contract of purchase, was then on hand in Boston, piled up in warehouses, where it had been kept on storage from the time of its importation under the original contract of purchase; and that they, the defendants, were in condition to carry out the contract for the purchase of the iron as originally contemplated; whereas, in truth and in fact, as was then well known to the defendants, but was not known to the plaintiffs, the whole of the two thousand tons of iron, which had been imported under the original contract of purchase, except the four hundred and ninety-one tons which had been shipped to California as aforesaid, had been sold and disposed of to other parties, and no part of the same was then on hand in Boston or elsewhere, nor were the defendants in a condition to carry out the

contract for the purchase of the iron as originally contemplated. The plaintiffs, thereupon confiding in said statements and representations made by the defendants, and believing the same to be true, and that they were consequently bound to assume and carry out the said original contract for the purchase of the iron, were induced to, and did enter into a contract with the defendants, bearing date the 15th day of January, 1855, whereby the plaintiffs, among other things, assumed the original contract of the railroad company for the purchase of the iron, and bound themselves to carry out the same, on the part of the railroad company, so far as related to the price to be paid for the iron, although such price greatly exceeded the then market value of such iron in Boston. At the time said last mentioned contract was proposed by the defendants, the plaintiffs required of the defendants that they should insert in it the words, or to the effect, "that they (the defendants) would deliver to them (the plaintiffs) the iron originally purchased by said Wilson from Weld & Co., agents of Thompson & Forman, of England," and gave to the defendants as a reason for such requirement, that if the iron so originally purchased by Wilson from Weld & Co. was not then on hand as alleged by the defendants, they, the plaintiffs, were relieved entirely from carrying out the said Wilson contract for the purchase of iron. And further, the plaintiffs then refused to make or execute any contract with the defendants respecting said iron, unless words to the effect above stated were inserted in it. Thereupon the defendants, contriving and fraudulently intending the more effectually to deceive and defraud the plaintiffs in the premises, consented and agreed that words to such effect should be inserted in said contract pursuant to such request; and accordingly the words "which said iron was originally purchased by C. L. Wilson from W. F. Weld & Co. of Boston," were inserted therein, before the same was executed by the parties thereto. That the plaintiffs,

Robinson *v*. Flint.

by means of the false, fraudulent and deceitful statements and representations made by the defendants as aforesaid, and the false, fraudulent and deceitful representations made by the words inserted in the contract, as above mentioned, were deceived and defrauded, and were induced to, and did enter into a contract for the payment, and have since paid a much larger sum of money than the iron was worth, and a much larger sum than they would have paid, or agreed to pay for the same, had they known the truth in relation to the matters concerning which such statements and representations were made. That the plaintiffs, after the making of said agreement of the 15th of January, 1855, proceeded to construct and equip said railroad in California. That as fast as iron rails arrived and were delivered to the plaintiffs by said defendants, they were piled up ready for use, and soon thereafter used in the construction of such road. That the iron thus delivered by the defendants to the plaintiffs at San Francisco aforesaid, and used in the construction of such railroad, was not the iron which had been imported under the original contract of purchase; was not manufactured by Thompson & Forman, or by manufacturers of equal celebrity, nor was it of their best quality; and was not the iron originally purchased by said C. L. Wilson, of W. F. Weld & Co. of Boston; but the same was of many different patterns, badly manufactured, and, besides, subsequently proved to be, and was of a very inferior quality, not worth exceeding $35 per ton of two thousand two hundred and forty pounds, deliverable in Boston or New York in bond. That by reason of such iron rails being of different patterns, and of an inferior quality, and badly manufactured, and especially by reason of their not being or like unto the iron originally purchased by said C. L. Wilson, of W. F. Weld & Co. of Boston, the said railroad company claimed from these plaintiffs damages therefor to the amount of $50,000, and refused to pay the plaintiffs the contract price for the con-

struction of such road until after a suit brought, and until the plaintiffs paid and allowed said claim for damages, by permitting said company to deduct therefor said $50,000 from such contract price. That at or about the time of the delivery by the defendants of said iron, as above stated, the plaintiffs paid said defendants Flint, Peabody & Co., for and on the joint account and benefit of the defendants, the said original contract price of $48 per ton, deliverable in Wales, together with all freight, insurance and charges alleged by the defendants to have been paid or incurred by them under said contracts, and to be chargeable against said iron. That the whole amount so paid by the plaintiffs to said defendants for and on account of said iron, during the period between March, in the year 1855, and January, in the year 1857, was the sum of $216,744.28, or thereabouts. That the defendants included in said sum as chargeable against said iron, various items for insurance, alleged to have been effected by them, upon said iron for the account and benefit of the plaintiffs, amounting in the whole to a sum exceeding $6496; also various items for storage alleged to have been incurred and paid on said iron, amounting in the whole to about $2000; whereas neither of said sums or items so charged against said iron, and paid by the plaintiffs, were paid or incurred by the defendants, or either of them, for or on account of the iron so originally purchased, nor were any or either of said sums or items chargeable against the iron, or against the plaintiffs; nor were the plaintiffs in any way liable to pay the same. That each and every of such false and fraudulent representations, and said fraudulent items and charges last referred to, had been discovered by the plaintiffs since they paid the defendants for and on account of the said iron so delivered; and each and all of said payments were made in ignorance of the fraud and deceit practiced in manner herein stated by the defendants upon the plaintiffs. That by reason of the false and fraudulent representations and statements so

Robinson v. Flint.

made by the defendants, and by reason of the fraud and deceit practiced by the defendants upon and towards the plaintiffs in manner set forth, and by reason of the several matters and things before stated and alleged, the plaintiffs had been injured and damaged to the sum of $171,000, with interest thereon from the 1st day of October, in the year 1855; and which sum they claimed to have and recover from the defendants, in this action.

*Second.* The plaintiffs further stated, as a distinct and separate cause of action against the defendants, that the several matters above set forth and stated, down to and including the making of the contract between the plaintiffs and the defendants, are true; and that by said contract the defendants agreed, among other things, to send to San Francisco all the balance of the iron for said railroad, amounting to about one thousand five hundred tons, which was originally purchased by C. L. Wilson from W. F. Weld & Co. of Boston. That notwithstanding such agreement or contract, the defendants did not send to San Francisco, nor deliver to the plaintiffs, said balance of fifteen hundred tons of railroad iron which was originally purchased by C. L. Wilson from W. F. Weld & Co. of Boston; but, on the contrary, delivered to the plaintiffs at San Francisco, aforesaid, a very inferior quality and character of iron of different patterns, and which was not worth exceeding $35 per ton of two thousand two hundred and forty pounds, deliverable in Boston aforesaid, in bond, which would be equal to an average cost of $57 per ton delivered in San Francisco, with all the duties and charges paid thereon. That the iron rails so delivered by the defendants were immediately piled up for use, and soon thereafter used by the plaintiffs in the construction and completion of such railroad. That the quality of such rails could then be determined only by actual use and wear. That although such rails so delivered appeared to be not of the patterns originally purchased by said C. L.

Wilson from W. F. Weld & Co., yet the plaintiffs were under the necessity of accepting and using the same, to enable them to construct said railroad within the time limited in their agreement, and also to prevent an incalculable loss, which would have resulted from permitting the roadway as then prepared, with machinery, rolling stock, &c., to wait until iron rails of a proper kind and quality could be purchased in and received from the Atlantic States. There being at that time no other railroad constructed, or in progress of construction, in said California, and no facilities or means of obtaining such iron rails in said State of California, or elsewhere on the Pacific coast. That such iron rails so delivered and used were not manufactured by Thompson & Forman, or by manufacturers of equal celebrity; nor were they of their best quality, and were not the iron originally purchased by said C. L. Wilson from W. F. Weld & Co. of Boston. But, on the contrary, the same were badly manufactured, of many different patterns, and, by subsequent use, proved to be, and actually were, of a very inferior quality, not worth exceeding $35 per ton in bond, in Boston, as above stated. That by reason thereof, the said railroad company claimed from the plaintiffs damages arising therefrom to the amount of $50,000, and refused to pay the plaintiffs the contract price for the construction of such road until after suit brought therefor, and until the plaintiffs paid and allowed said claim for damages, by permitting said company to deduct the damages thus claimed, viz., $50,000, from such contract price. That the plaintiffs paid to the defendants for the said balance of iron thus delivered, viz., one thousand five hundred and eight tons, nineteen hundred weight, two quarters and twenty-three pounds, the sum of $163,298, or thereabouts—the amount paid being equal to $108.22 for each ton thus delivered in California, with duties and charges paid thereon. That the difference between the actual value of the iron thus

delivered, and the actual amount thus paid by the plaintiffs to the defendants, in ignorance of the fact that the iron thus delivered was not the iron so originally purchased by C. L. Wilson of W. F. Weld & Co. of Boston, nor iron of equal quality, kind, or character, amounts to the sum of $77,285. That such payments were made as cash on the 1st day of October, 1855, with interest after that date; and the plaintiffs therefore claimed that they were entitled to have and recover of and from the defendants the said sum of $77,285, together with interest thereon from said 1st day of October, 1855. The plaintiffs therefore demanded judgment against the defendants for the sum of $171,000, with interest thereon from the 1st day of October, 1855, besides costs.

The defendants, by their answer, denied the material allegations of the complaint.

On the trial, at the circuit, before Justice ALLEN, without a jury, in November, 1863, the agreement between the parties, of January 15, 1855, was introduced in evidence. It contained the following clause, among others: "1st. Messrs. Gliddon & Williams, and Flint, Peabody & Co., agree to send forthwith to San Francisco, all the balance of the iron for said railroad now laying in Boston or New York, amounting to about fifteen hundred tons, which said iron was originally purchased by C. L. Wilson, from W. F. Weld & Co. of Boston," &c.

When the plaintiffs rested, the defendants' counsel moved to dismiss the complaint, upon the following grounds: That the representation alleged to have been made by the defendants, as charged by the plaintiffs, that the iron imported under the original contract with Wilson was on hand in Boston, piled up in warehouses, if made, was of a matter wholly immaterial.

That the plaintiffs had not proven that the representation made was untrue.

That the plaintiffs have not shown, nor was there any

evidence tending to show, that the defendants, if they made the representation, and if it were not literally true, knew, on the 15th of January, at the time that the alleged representation was made, that it was untrue.

That the plaintiffs, being put in communication with the responsible party, and the party who alone had knowledge, or could be presumed to have actual knowledge, had no right to rely upon the conversation of the defendants, who could know nothing but what Weld & Co. told them in relation to the matter.

That a more general proposition, which would be pertinent if this were an action upon the contract, was that the acceptance of the iron at the hands of these plaintiffs would discharge any obligation of the defendants.

Upon the decision of that motion by the court, the following opinion was delivered:

ALLEN, J.   What I have to say will be very brief, and will necessarily be very desultory, from the want of time to examine the large number of papers and documents introduced in the case.

*First.* As to the decision of the case by the special term upon demurrer:(*a*) I will not say what effect the decision by Judge Ingraham then would have had upon the questions made, and heretofore ruled upon by me, had my attention been called to it at an earlier stage of this trial. Certainly I would have followed it, not only because such a decision thus made should be the law of the case until reversed, but also by reason of the deference due to the learned judge by whom the decision was made.   But I do not regard that decision as controlling here, for the reason that the questions now made were not considered by the court on that occasion, as is apparent upon the face of the report itself.   In regard to the sufficiency of the complaint as a complaint for fraud, the opinion is very brief,

(*a*) See 16 How. Pr. R. 240, S. C.

Robinson *v.* Flint.

and lays down general principles, which have not been controverted. I infer that the point was not raised upon which the principal discussion has taken place here, viz., as to the materiality of the representations and their bearing upon the parties and their relations. The principal point discussed, doubtless, was upon the misjoinder of the causes of action, viz., one in tort, and the other upon contract. Judge Ingraham discusses that question, and holds that both causes of action, assuming one to be in tort, and the other upon contract growing out of the same transaction, might be joined. I regarded both counts of the complaint as in tort, in the earlier stages of the trial, and they were so treated by the plaintiffs' counsel; but if this was wrong, I think the evidence excluded would have been excluded even if the second count had been regarded as upon contract. I have to some extent, in the discussion of other questions, given my views of the relations of the parties in this case, but not in relation to the construction of the contract upon which this iron was sold and delivered to the plaintiffs.

*Second.* As to the contract between Thompson & Forman, by Weld & Co. as agents, and the Sacramento Valley Railroad Company, which was carried out and executed by the delivery of the iron to the plaintiffs, who assumed that contract and took the iron, I do not regard this contract as having reference to any particular specific iron, or iron of any particular manufacture, then or thereafter to be made. My judgment is, that the contract would have been fulfilled by the delivery of any iron which conformed to the pattern, and which had been or should thereafter be manufactured either by Thompson & Forman, or by any other manufacturer of equal celebrity. The contract, in its specifications, had reference rather to the quality and kind of iron than to the particular manufacture, and Weld & Co., as the agents of Thompson & Forman, might have

performed this contract by delivering any iron conform-
ing in quality and size to that called for.  They might
have delivered it within the time limited by the contract,
or before they were put in default.  The iron was to be
delivered, or ready for delivery, (except 500 tons to be
delivered at Boston,) in Wales by a certain time specified,
and when put on board ship in Wales, it remained the
property of Thompson & Forman, and went forward to
California as their property.  It was understood that the
iron was to be shipped to California via Boston, to be in-
sured from Wales to Boston, and from Boston to Cali-
fornia; the insurance to be paid by Weld & Co.; the
charges for insurance, as well as other charges, were to be
refunded by the railroad company on the arrival of the
iron at California.  There was to be no delivery under
the contract to the railroad company, until those pay-
ments were made, and upon the failure to perform by the
railroad company, it was optional with the sellers whether
they would proceed with the contract or not.  The rail-
road company were in default for not paying for the 491
tons already in California.  The defendants were the
guarantors for the railroad company, and were to be the
carriers of the iron from Boston to San Francisco, and
they were to collect the charges and receive the securities
from the railroad company for the iron, and remit the
same to Weld & Co. at Boston.  To some extent they were
the agents of both parties in receiving and remitting the
charges and pay for the iron to Weld & Co.  Now, at the
time of these alleged misrepresentations, the plaintiffs had
become the contractors with the Sacramento Valley Rail-
road Company, to build the road, and had agreed with
that company to assume this contract for iron, the contract
with the defendants for the carriage of the iron, and for
other duties to be performed by them, and certain other
contracts for locomotives, cars, &c., with other persons,
subject only to the proviso, that the other parties to these

several contracts were in a situation to perform them as originally contemplated. The object of that arrangement is very evident. The Sacramento Railroad Co., although they had been unfortunate, and were perhaps insolvent, were, nevertheless, legally liable upon this contract, and the defendants were under liability as their sureties, and their desire was to rid themselves of that responsibility, and to induce the contractors for the road to take the contracts off their hands, take their place and assume their liabilities under them. Therefore, the only condition annexed to the plaintiffs' agreement to assume them was that the parties to these contracts should be in a condition to perform on their part, for only in that case could they compel a performance by the railroad company, or charge them for non-performance. Mr. Robinson says, with this liability resting upon the plaintiffs, under the agreement to assume the contract, not only with the defendants here, but with Weld & Co., representing Thompson & Forman in these contracts, he came to Boston to ascertain whether the parties were in a situation to perform. Thompson & Forman were not then in default for not furnishing iron either in Wales or in Boston. The default, so far, was upon the railroad company; but the contract remained in force, provided Thompson & Forman so chose; it was entirely optional with them, whether by the failure of the railroad company they should declare the contract void, and treat it as rescinded, and abandon it, or tender all the iron, and insist upon the performance by the company and their guarantors. They had a right to call upon the railroad company to receive the iron, and pay for it according to the contract, and if they were in a situation to perform it by furnishing iron they had imported or shipped from Wales for that purpose, they could do so, or they could perform by furnishing other iron of the same quality, and same manufacture, conformably to the patterns which had been furnished

them. The plaintiffs were not at liberty to repudiate the contract, whether any particular and specific iron was on hand or not. Thus situated, Robinson called upon the defendants to inquire in respect to this contract, and they learned then that the defendants were guarantors of the railroad company, and therefore subject to the same liability which rested upon the company; liable, if Weld & Co. or Thompson & Forman insisted upon the performance of the contract, either to take the iron themselves, pay for it, or respond in damages. Robinson inquired of the defendants about the iron contract, and the charge is, that the defendants said the iron was on hand. If I am right in respect to what I have said, it was not material whether the particular iron imported from Wales was on hand, or not. The question upon which the plaintiffs' liability to assume the contract rested, was whether Weld & Co. or Thompson & Forman were in a situation to perform the contract. If they were, then the liability was upon the plaintiffs to carry out the contract, and it did not require a new engagement on their part or create an obligation to do so, to receive the iron and pay for it. There is no allegation in the complaint that the defendants were not in a situation to perform their contracts, or that the plaintiffs were not bound by their contract with the railroad company, to assume and perform this iron contract.

*Third.* If reference was made to the contract with Weld & Co., there is no claim that the defendants were not in a position to carry out and perform their guaranty, and also their contract with the railroad company. These were the only contracts they had made, or which they could be called upon to perform. They had no other connection with the iron. Then, whether the particular iron was on hand was not material. The real question was whether Weld & Co. were in a situation to perform their contract; in such a situation that they could have compelled the railroad company to have received the iron of them. If so,

then the plaintiffs were bound to take it. There is certainly no evidence that they were not in such a situation, and no claim that such a representation would have been untrue. Whether they had a particular shipment, a particular invoice of iron piled up in warehouses in Boston, was not at all material, because it did not go to the question of their situation and ability to perform their contract. Reference has been made to the invoice of certain iron which was shipped from Wales to Weld & Co. for account of the railroad company. Who were the legal consignees of that iron, is not very material. Very likely in some sense the railroad company may be regarded as the consignee, under the bill of lading. If the plaintiffs' counsel be right, that the iron did go forward as the iron of the railroad company, and was in truth their iron, then certainly their claim would be against Weld & Co. for a wrongful disposal of it, and not against the defendants upon their representation. But the iron was not the iron of the railroad company, and was not so appropriated as to give the plaintiffs or the railroad company the right to insist upon this specific iron, and reject all other. Reference has also been made to the first clause in the contract between Gliddon & Williams, and Flint, Peabody & Co., and Robinson, Seymour & Co.

" 1st. Messrs. Gliddon & Williams, and Flint, Peabody & Co. agree to send forthwith to San Francisco, all the balance of the iron for said railroad now laying in Boston or New York, amounting to about 1500 tons, which said iron was originally purchased by C. L. Wilson from W. F. Weld & Co., of Boston."

I do not regard that either as a representation or warranty that there was any such iron on hand, or any agreement to carry any particular iron designated and separated from all other iron. It is rather a description of what particular iron was to be sent, the source from which it was to come, restricting it to iron which was furnished, or to

be furnished, under the contract of Weld & Co. with the railroad company. Reference has been made to the freight, insurance, etc., upon the iron delivered to Robinson, Seymour & Co., and charged in the account rendered by Flint, Peabody & Co., which is in evidence, together with another statement, which is the account of Weld & Co., referred to in it. Take these two accounts together, and they show that the property went forward, not as the property of Flint, Peabody & Co., and not as shipped by them, but as shipped by Weld & Co., going forward as their property. The charges were made against the iron by Weld & Co., and not by Flint, Peabody & Co., and are so represented in the account rendered. Whether these accounts were right or not, the defendants were not at all responsible for any errors or overcharges. That is a matter between Robinson, Seymour & Co. and Weld & Co. If Weld & Co. rendered incorrect charges, and charged for freight which they had not in fact paid; if they charged payments which they could not have made, that is a matter to be settled between the plaintiffs and Weld & Co. The payment was but a settlement between Robinson, Seymour & Co. and Weld & Co., through Flint, Peabody & Co., at San Francisco. Flint, Peabody & Co. did not assume any new relation to the parties, or change their position in any respect by this new contract which they made with the plaintiffs in January, 1855. They still retained the same position, carrying the iron for Weld & Co., subject to such charges as Weld & Co. chose to impose upon it, collecting those charges, and remitting them according to the original contract. If there was any wrong done here, it was done by Weld & Co.; and then I might remark, in this connection, that the accounts were settled by Robinson, Seymour & Co. without any objection; that all the items were paid, and they must have known that the iron which they were receiving was not the same iron upon which freight was charged from Wales. For in-

Robinson *v.* Flint.

stance, the freight, as charged in this account of Robinson, Seymour & Co., is for iron shipped from Wales to Boston, whereas the contract provides that a certain part of it shall be shipped from New York, and a great part of it was actually shipped from New York; so it could not have been the same iron upon which freight was charged. They practically treated it as a contract for furnishing any iron which answered the description of the contract, rather than for a particular or specific iron which had been imported. In any view of the case, the plaintiffs' legal liability and legal duties were not changed by the contract they made with the defendants, so far as the contract with Weld & Co. is concerned; and whether they were induced to make the contract with the defendants by the representations alleged, is not material. In any aspect, the questions were not material to the matter in hand between the parties. It is suggested here that there may have been a mistake as to the legal rights of the parties; and the position taken by the counsel for the plaintiffs is, that we must treat the matter as if the parties' rights were as they supposed them to be—that is, if the plaintiffs were induced to do what they were bound to do, irrespective of the representations, because of the representations, that the defendants were nevertheless responsible if the plaintiffs mistook their duties and liabilities. I do not so regard it. I think we must ascertain their legal position, and see whether the plaintiffs were and could have been induced by these representations to change their legal position and legal responsibilities; and it is evident that their legal position was not changed by the new contract. I do not think the action can be maintained, and I will therefore grant a nonsuit.

The court thereupon decided to order a nonsuit, and ordered it accordingly; to which decision and order the plaintiffs duly excepted.

*David Dudley Field*, for the plaintiffs.

I. According to the contract made March 10, 1854, the iron was to be manufactured by Thompson & Forman, or by manufacturers of equal celebrity, and to be of their best quality, to be like two patterns agreed upon, to be of a specified length, and to be ready for delivery, five hundred tons in Boston by May 15, seven hundred and fifty in Wales by June 1, and the rest by June 15. Let it be recollected, that the iron thus contracted for had been manufactured, had been delivered in Wales, had been brought to Boston, and there, instead of being kept for the railway, had been sold and dispersed. This was the condition of things when Mr. Robinson made his appearance and instituted his inquiries. His object was explained. He thought it possible that the iron might have been disposed of to others, and for that reason inquired. He was assured that the iron was still on hand, and the defendants in a condition to carry out the contract as originally contemplated. It is evident that both parties then understood that if the iron, which had been imported for the railway, had been sold to others, the defendants were not in a condition to carry out the contract as originally contemplated. Were they both mistaken; so that although one intended to deceive the other, and did deceive him, and by the deception induced him first to sign a new contract, and afterwards to take the iron sent forward under it, yet the deceiver incurred no responsibility? In other words, were the plaintiffs, before the deception, compellable to do all they did afterwards, under the influence of the deception? In answering this question, we should, in the first place, look beyond the strict legal rights of the parties to the contract between the railway company on one side, and the defendants with Weld & Co. on the other. The present plaintiffs were not parties to that contract, nor affected by it in any way, except as they chose to become so, by their own contract with the railway com-

pany; and when they did so, they made their own terms. One of these terms was, that they should not be bound to take upon themselves the contracts of the company with the defendants and Weld & Co., unless these contracts could be carried out as originally contemplated. The first question therefore is, whether it was or was not contemplated that the iron should be ready for delivery in Wales during June. Most clearly that was contemplated. But when delivered in Wales, it was to be brought directly to Boston by Weld & Co., and there taken by the defendants in this case, Gliddon & Williams, and Flint, Peabody & Co., for transportation to San Francisco. That was as much contemplated as the delivery in Wales. Was it contemplated that the iron thus delivered in Wales and brought to Boston might be sold there, and other iron substituted? Surely that could not have been contemplated. And if not, then the sale of the iron which had been imported put it out of the power both of the defendants and of Weld & Co. to carry out the contract as originally contemplated. So much as to what was contemplated, without considering what might possibly be the strict legal rights of the original parties.

But, in the second place, if we regard only these strict legal rights, the sale of the iron by Weld & Co. or the defendants either terminated the contract between them and the railway company, or, at the very least, left the latter at liberty to decline the receipt of other iron of a different description and inferior quality. 1. When the one thousand five hundred tons of iron were delivered by Thompson & Forman on board ship in Wales, they became the property of the railway company, subject to whatever lien may have remained, for the price and charges of transportation. It was shipped "for account of the Sacramento Valley Railroad Company." The judge ruled, indeed, that the iron went forward, even to California, as the property of Thompson & Forman. In that, however,

we submit, that he was mistaken.   If it had been lost on its way to California, or to Boston, the loss would have fallen on the company.   Such is the legal result of the three contracts; two of March 10, and the other of March 17, 1854.   When the iron was once on board ship in Wales, nothing further was to be done by Thompson & Forman.   The delivery was to be in Wales.   To whom? To the masters of such vessels as might be provided by the company.   Weld & Co. from that moment ceased to act exclusively as the agents of Thompson & Forman. They remained such agents, perhaps, so far as to retain any lien they may have had for the price, but they became the agents of the company " to advance the money to pay the freight from Wales to Boston."   If they were to bring forward the iron as the property of their principals, their agreement to advance the freight for the company would have been superfluous.   The company was to " take all risk and responsibility of procuring vessels to transport said iron from Wales to Boston, and from Boston to San Francisco."   Gliddon & Williams were to ship the iron from Boston to San Francisco in vessels of their line, to the consignment of Flint, Peabody & Co. for the company. And in the new agreement of January 15, 1855, between the defendants and the plaintiffs, it was expressly stipulated that the property was to be considered at the risk of the plaintiffs before its actual receipt by them.

When things sold are identified, and the seller has done all that he has to do about them, the property passes, though there has been no actual delivery.   (*Wooster* v. *Sherwood,* 25 *N. Y.* 278.   *Fry* v. *Lucas,* 29 *Penn.* 356. *Haxall* v. *Willis,* 15 *Gratt.* 434.   *Tompkins* v. *Dudley,* 25 *N. Y.* 272.   *Waldron* v. *Romaine,* 22 *id.* 368.)   In the case last cited, goods were sold in bond for export to Canada, the seller undertaking to obtain the necessary permit.   They were placed on a vessel selected by the buyer, and were destroyed while detained for the permit.

Robinson *v.* Flint.

It was held that the title had passed and the loss was the buyer's. (2 *Kent's Com.* 492, *and cases there cited.*) The iron being thus the property of the company, the sale of it by Weld & Co., or Gliddon & Williams, or Flint, Peabody & Co., whichever did it, was wrongful, and extinguished the obligation of the company to pay for it, and the right of the others to demand payment for that or other iron. 2. If, however, the property in the iron did not pass to the company upon its delivery on board ship in Wales, but still continued in Thompson & Forman, its sale by Weld & Co., or by the defendants in this case, put it out of their power to carry out the contract as originally contemplated, for the following reasons: (*a.*) It was originally contemplated that a specific quantity of iron should be shipped from Wales by June 15, 1854. This iron had been shipped for account of the railroad company of which Wilson was president, but had, been sold by Weld & Co. to other parties. By this act Weld & Co. put it out of their power and the power of the defendants in this case to fulfill the contract as originally contemplated. They had disposed of all the iron ever shipped to them before June 15, 1854, and of the precise iron which had been delivered by Thompson & Forman under the Wilson contract. By thus disposing of the thing sold, without the consent of the buyers, they elected to rescind the contract. (*b.*) If the iron imported prior to June, 1854, was not imported for the railroad company, then Weld & Co. were in default, and the company were at liberty, whenever they discoverd the fact, to treat the contract as rescinded. (*Hoare* v. *Rennie*, 5 *Hurlst. & N.* 19. *Miller* v. *Phillips*, 31 *Penn.* 218.) (*c.*) Even if, as the judge assumed, both parties to the contract were in fault, the long delay was strong evidence of an abandonment thereof on both sides. (*Lawrence* v. *Knowles*, 5 *Bing. N. C.* 399. *Harris* v. *Bradley*, 9 *Ind.* 166.) (*d.*) The contract having been rescinded by the act or delay of Weld & Co., with-

out the knowledge of the plaintiffs, the agreement of the latter to assume this contract, it being then not in existence, was of no effect. The railroad company was also ignorant of the acts of Weld & Co. in rescission of the Wilson contract, and therefore the recognition of that contract, in the agreement between the plaintiffs and the company, could not revive that extinct contract. A ratification is not binding unless made with a full knowledge of the facts affecting the transaction. (*Seymour* v. *Wyckoff,* 10 *N. Y.* 213, 224. *Cobb* v. *Dows, Id.* 341. *Nixon* v. *Palmer,* 8 *id.* 398. *Brass* v. *Worth,* 40 *Barb.* 648. *Pratt* v. *Philbrook,* 41 *Maine,* 132. *Freeman* v. *Rosher,* 13 *Q. B.* 780. *Owings* v. *Hull,* 9 *Peters,* 607.)   (*e.*) But if we should concede that the Wilson contract was in force, and that the railroad company had waived the delay up to the time of its contract with the plaintiffs, yet, in January, 1855, they were entitled to demand an *immediate* performance, and to rescind, if this demand was not complied with. (*Benson* v. *Lamb,* 9 *Beav.* 502. *Frost* v. *Clarkson,* 7 *Cowen,* 28. *Morange* v. *Morris,* 34 *Barb.* 311.) The plaintiffs had, of course, the same right. But the defendants, by their misrepresentations, induced the plaintiffs to forego this right, and to accept a pretended performance by installments, when, if the plaintiffs had not been thus deceived, they could have compelled Weld & Co. to give up the contract. (*f.*) The contract between the plaintiffs and the railroad company should be construed as strictly against the claims of Weld & Co., and the present defendants, and as favorably for the plaintiffs, as if they were sureties. They were entitled to a strict and prompt performance on the part of Weld & Co. and the defendants. (*Wilson* v. *Roberts,* 5 *Bosw.* 100.) This, Weld & Co., and the defendants, could not render, and the plaintiffs were therefore exonerated. (*g.*) The contract between Wilson on one side, and Weld & Co. and the defendants on the other, not being unilateral, and exclusively for the benefit of the latter, their

Robinson *v.* Flint.

consent to the plaintiffs' assumption thereof was not to be presumed, but only to be inferred from positive action. Until such action was taken, the plaintiffs' contract might have been rescinded by the mutual consent of the plaintiffs and the railroad company. Of this opportunity to rescind, the plaintiffs were deprived by the deception of the defendants.

II. It was not necessary to prove that the defendants knew their representations to be untrue. 1. It was enough for the plaintiffs to show that the defendants' representations were untrue. The burden of proof was then placed upon the defendants to show that they believed their statements to be true. 2. Even if the defendants did not know their statements to be false, yet as they made these statements *positively*, without knowing or having good reason to believe them to be true, the defendants are liable. (*Bennett* v. *Judson*, 21 *N. Y.* 238. *Craig* v. *Ward*, 36 *Barb.* 377. *Atwood* v. *Wright*, 29 *Ala.* 346.) If the foregoing points are well taken, the nonsuit was an error and should be set aside.

III. Whether the inability of the defendants to fulfill the original contract had or had not been previously shown, it is certain that upon the court's expressing its opinion that it had not been shown, the plaintiffs made a formal offer to supply the proof. This was refused. The refusal was not put upon the ground that the offer was too late. It appears to have been because the offer united Weld & Co. with the defendants. Now, it is quite true that the complaint did not allege either that the representations related to the ability of Weld & Co. to fulfill, or that they were in fact unable to fulfill, but that was strictly not necessary, since the inability of Weld & Co. was the inability of the defendants. Although the complaint only alleged that the defendants were not in a condition to carry out the contract, yet it is clear that this was meant to include Weld & Co. The defendants had agreed to

transport certain iron, to be delivered by Weld & Co. If Weld & Co. could not deliver it, clearly the defendants could not transport it, since they had no authority to buy it, nor to take it from any one except Weld & Co. How could the defendants be in a condition to carry out the contract, if Weld & Co. were not? But the offer was to prove the "inability of the defendants in the case, and Weld & Co. together, to carry out the conjoined contract." The contract was conjoined. The defendants had made themselves parties to the first contract between the company and Weld & Co. The inability of the defendants to carry out this contract was the very point in dispute. To reject the offer because, in making it good, the plaintiffs would have proved something more, that is, would have proved that Weld & Co. also were unable to fulfill, does not appear to be legal or reasonable.

IV. The court erred in excluding the evidence offered to show the bad quality of the iron shipped to California by the defendants. The evidence was competent for several purposes: 1. As tending to show that the iron sent to California was not imported under the Wilson contract. Of this, if it was not conclusive evidence, it was certainly, in connection with all the other circumstances of the case, partial evidence. 2. The evidence was proper, as bearing upon the amount of damages. Upon this it was indispensable. 3. It was proper, as proving the allegations of the second claim. One of the allegations therein was, that the defendants had not sent to California the iron imported under the original contract, but inferior iron; surely it was competent to make this proof, if the second claim was good for anything.

V. Coming now to the second cause of action, the plaintiffs submit, that the court erred in granting a nonsuit as to that. This claim is upon contract. It avers that the defendants, by their contract with the plaintiffs, of January 15, 1855, "agreed, among other things, to send to San

Francisco all the balance of the iron for said railroad, amounting to about 1500 tons, which were originally purchased by C. L. Wilson from W. F. Weld & Co. of Boston;" and "that notwithstanding such agreement or contract, the defendants did not send to San Francisco nor deliver to the plaintiffs said balance of 1500 tons of railroad iron, which was originally purchased by C. L. Wilson from W. F. Weld & Co. of Boston, but, on the contrary, delivered to the plaintiffs at San Francisco, aforesaid, a very inferior quality and character of iron of different patterns," &c., and such iron rails "were not manufactured by Thompson & Forman, or by manufacturers of equal celebrity, nor were they of their best quality, and were not the iron originally purchased by said C. L. Wilson from W. F. Weld & Co. of Boston." The contract was proved, and it was also proved that the defendants did not send to San Francisco, or deliver to the plaintiffs all or any balance of the iron for the railroad originally purchased by C. L. Wilson from Weld & Co., of Boston. In place of sending the iron admitted by them to be on hand, they sent other iron, of an inferior quality, by means of which the plaintiffs sustained a loss of at least $50,000. Why, then, should not the plaintiffs recover? We are told, indeed, that there was no balance of iron on hand to be sent, and no representation or warranty that there was. But is this a just view of the contract, or of the evidence? Are not the defendants in this double predicament? 1. They assured the plaintiffs, orally, that the 1500 tons were on hand. By that means they induced them to enter into the second contract. They are estopped, therefore, from now asserting the contrary. The case against them, in that view, is this: they admitted that the iron was on hand, and agreed to transport it. They have not transported it, and for not doing so are responsible. This is true, whether the written paper (the second contract) contains a representation or not. 2. This paper does contain

Robinson *v.* Flint.

a representation, or agreement, that there was such a balance on hand. The reasoning of the learned judge is thus stated, repeating the words of the contract. He says: "I do not regard that either as a representation or warranty that there was any such iron on hand, or any agreement to carry any particular iron designated and separated from all other iron. It is rather a description of what particular iron was to be sent, the source from which it was to come, restricting it to iron which was furnished or to be furnished, under the contract of Weld & Co. with the railroad company." But is not this an error? An agreement is to be interpreted as the party making it supposed the other understood it. Can there be any doubt, that the plaintiffs understood this to mean, that there were so many tons on hand of the iron originally imported, and that the defendants undertook to transport that to San Francisco? See how otherwise the defendants may escape all responsibility whatever. They may escape from the consequences of the misrepresentation, if, as the court says, it was immaterial; and they may escape from the consequences of the contract, if, as the court says, there was no misrepresentation? The construction which the judge gave to the stipulation adds to it, in effect, the words, "if there is any," so as to read: Messrs. Gliddon & Williams, and Flint, Peabody & Co., "agree to send forthwith to San Francisco all the balance of the iron for said railroad now lying in Boston or New York, amounting to about 1500 tons, if there is any." Let us imagine that it had been proposed at the time to insert such words. Either the person proposing to do so would have been laughed at as a fool, or denounced as a knave. Will it be said, however, as it was said at the trial, that the plaintiffs received the iron, and that debars them from recovering damages for non-fulfillment of the contract? If so, we answer: 1. That regarding the statement about the iron being on hand, and origin-

Robinson *v.* Flint.

ally imported under the contract, as a warranty, (which it really was,) the rule is well established, that the acceptance of an article, and paying for it, does not preclude the purchaser from afterwards recovering from the seller damages for breach of the warranty. (*Pateshall* v. *Tranter*, 3 *Ad. & El.* 103. *Coventry* v. *McNery*, 13 *Irish C. L.* 160–163.) 2. That if the statement was not a warranty, still the purchaser is not precluded from claiming damages, unless he had notice of all the defects of the article, and was in a situation to reject it, without serious loss or inconvenience. The rule is one of acquiescence or waiver. (*Sedg. on Dam.* 287, 3d ed. 1 *Pars. on Cont.* 592, 5th ed. *Voorhees* v. *Earl*, 2 *Hill*, 288, *Shields* v. *Pettee*, 2 *Sandf.* 262. *Fitch* v. *Carpenter*, 43 *Barb.* 40. *Reed* v. *Randall*, 29 *N. Y.* 358.) Suppose the Atlantic cable had been manufactured by two establishments, and the first portion used had proved good, but the other had been found in mid-ocean to be defective, is it the rule of law, that if the company did not forthwith turn back and tender the bad portion to the manufacturers, it was bound by its acquiescence to pay the full price for the inferior thing? In the present case, the plaintiffs could not foresee the principal defects till the iron was used; and if they had foreseen them, they were in a situation in which they could not return the iron, or refrain from putting it down. That it did not satisfy the contract, was known beforehand to the defendants, and not to the plaintiffs. One of the defendants was a director of the railway company; and, as such, claimed damages of the plaintiffs for not furnishing the stipulated iron. It is not conceivable that, under such circumstances, the plaintiffs are precluded from claiming that the defendants shall make good to them the loss which they have sustained by what was, on the part of the defendants, equally a breach of faith and a breach of contract.

*C. O'Conor*, for the defendants.

I. Neither by their original agreement with the railroad company, dated March 17, 1854, nor by their subsequent agreement with the plaintiffs, dated January 15, 1855, did the defendants warrant to the purchasers the quality of the iron, or anything concerning it.   1. The iron was purchased by the company from Wm. F. Weld & Co.   The defendants were not the sellers.   On the contrary, they were the agents of the purchasers, and sureties for them to the sellers.   Their duty was merely to receive such iron as Wm. F. Weld & Co. should produce to them for transportation, forward it to San Francisco, and there conduct the business of the purchasers in respect to it.   2. The reference to the balance of the iron, in the first clause of the agreement between the defendants and the plaintiffs, dated January 15, 1855, is not an undertaking or warranty by the defendants that there was then "lying in Boston or New York" specific iron which "was originally purchased by C. L. Wilson from W. F. Weld & Co."   (*a.*) If those descriptive or demonstrative words could be regarded as a representation, undertaking or warranty of any fact in regard to said iron, it could only be an undertaking, by and on the part of the employers, Robinson, Seymour & Co., with their agents and carriers, the defendants, that there was a lot of iron, substantially as described, which they, the defendants, were to have the job of carrying.   (*b.*) In fact, these words are a mere indication to the carriers, of the things to be carried.

II. Even if Weld & Co. were under no obligation to set apart, in Wales, certain particular rails, to keep the same scrupulously separate from all other rails, and to deliver the same identical rails to the purchasers, there is just enough in the contract of Weld & Co. to excite such a conceit in the mind of a litigious person who was wholly unacquanted with maritime commerce; but its provisions, taken together, forbid such a construction.   1. The deliv-

ery by Weld & Co. was to be in San Francisco, "within reach of the ships' tackles." The railroad company was to pay for the iron only "in notes payable in six months from the arrival of each shipment of iron at San Francisco." The "freights and other charges" were also to be paid only "on its arrival at San Francisco." So it will be seen that not only did the sellers take upon themselves the duty of safe delivery at San Francisco, and the risk of non-delivery from the perils of the sea, but they explicitly renounced all claim to payment for the iron, or to reimbursement for the charges, including freights, premiums of insurance, &c., unless there was an actual arrival of the iron "at San Francisco." As to the necessity of an actual delivery by Weld & Co. at San .Francisco, the contract is most precise and definite in all its aspects. When the word "delivery" is employed in connection with Wales or Boston, the language is always "ready for delivery." 2. The references to Wales and Boston, in connection with the word "delivery," related exclusively to *time.* The object was to accelerate action by Weld & Co. The delivery alluded to in these instances was not a delivery to the purchasers, but a delivery on shipboard. Weld & Co. did not bind themselves to deliver on shipboard by the times named, but only to be *ready* for such a delivery. The reason for this is apparent. Freighting vessels cannot always be procured, and it was provided that the company should "take all risk and responsibility of *procuring* vessels to transport said iron from Wales to Boston, and from Boston to San Francisco." This was to prevent any charge of delinquency against the sellers, in case of an unavoidable delay in procuring transportation. 3. Although the company was ultimately to pay all freight and charges, from the loading on shipboard at the " first port of shipment in Wales," including premiums of insurance, yet Weld & Co. were to advance all these charges, and were " to be repaid" only "on arrival of the iron at San Fran-

cisco." Quite in keeping with all this, is the absence of any stipulation giving the purchasers an interest in the policies of insurance, or a right to recover thereon in case of loss. That was to be the sellers' resort for indemnity, in case a peril of the sea should prevent them from making delivery at San Francisco. 4. All these complex provisions grew out of the fact that there was no market price for such iron, in this country. Although the purchaser buys the article deliverable here, he is obliged to pay the price ruling at the time in the foreign market, with interest from shipment *there*, and the whole cost of delivery added thereto. Accordingly, the price agreed upon in this contract was $48 per ton "free on board in Wales." 5. A particular kind of rails was not contemplated by the contract. They were only to be "like" the "patterns agreed upon." They were not required to be of Thompson & Forman's manufacture. If from "manufacturers of equal celebrity," it would suffice, provided they were of their (*i. e.* such *other* manufacturers') best quality." 6. Freights, insurance, and the ordinary shipping charges during the same period, in the same trade and on the same commodity, are so nearly alike that the price being made up of these cannot reasonably impress upon this contract the *identical-rail-notion* of the plaintiffs. If a shipment intended for a purchaser who failed, should reach Boston, whilst a shipment made to supply these purchasers was lost on the voyage, the sellers would not be excused for declining to deliver the former. The mere intentions or mental emotions of the manufacturer should not govern; in many cases it might be impossible to prove them. 7. The original agreement was dated March 10, 1854. It provided that 400 to 500 tons should be ready for delivery in Boston within fifty days. Surely Weld & Co. did not undertake, at that season, to send to Wales and get a load of iron shipped thence, and in Boston, within fifty days. And, besides, the contract between the defendants and the

railroad company, made March 17, 1854, contains two distinct statements that part of the purchased iron was then in Boston. It says, "the balance of the order, that part of it which *is to come* from England." Again, "it is understood that as *a large part* of this railroad iron is to be received from England, no definite period can be fixed for its shipment from Boston." Now the necessity of computing charges, &c. from the time of the first shipment in Wales, applied as fully to whatever amount Weld & Co. had ready in Boston at the date of the contract, as to that which was thereafter to be imported. This circumstance is, alone, sufficient to repel any faint argument in favor the identical-rail-notion that could be deduced from the reference to charges. 8. The agreement made by these plaintiffs with the defendants, January 15, 1855, is conclusive evidence that the plaintiffs themselves did not consider this contract of the company with Weld & Co. a purchase of specific articles, as they now pretend. That agreement expressly states that the iron to be sent to San Francisco was then "lying in Boston or New York;" and it refers to the shipment thereof "from *either* Boston *or* New York." In fact, two-thirds of it was shipped from New York, and received without objection on that account. Could this have been specific iron shipped from Wales to Boston, to go thence to San Francisco? 9. *Prima facie,* the identical-rail-notion would have had more reason or color, if the plaintiffs had contended that the original contract with Weld & Co. was for specific rails to be thereafter manufactured to order, according to the patterns. And there are words in the contract which might be wrested to favor this construction. But the facts noted in the preceding subdivision 7, conclusively repel it; and Robinson could not help swearing to the well known fact that Weld & Co. were constantly "receiving and selling iron of the same make and pattern, from the same parties." 10. Unless there be a clear indication to the con-

trary, a contract for the sale and delivery of merchandise of a particular kind or description is never deemed a *sale of specific articles;* but an executory agreement for the sale of any articles answering the description which the seller may deliver or tender. 11. The references to acts in Wales, as a guide in ascertaining the price to be paid the purchaser, cannot be used for the totally different purpose of converting the contract into a sale of specific articles.

III. The identical-rail-notion being, as is above shown, wholly unfounded, the alleged misrepresentation, if made, was perfectly immaterial.

IV. The railroad company had made its own contract with Weld & Co., and furnished its patterns. The defendants had no connection, directly or indirectly, with questions of quality, kind or fitness; and the alleged representations bore upon none of these questions. Robinson does not pretend to have directed his inquiries to any of these particulars. His *point*, as he states it, is a merely technical one; it is such as a captious person might devise to "wriggle out of a contract." So, if the identity was not material, the plaintiffs' sole point failed.

V. If the identity of the iron had been material, the plaintiffs failed to establish a case. 1. One of the seller firm, one of the intended carrier firm and two of the consignor firm were present. The joint guarantor interest was duly represented. The question put by the proposed new party, Robinson, looked to the substitution of his firm in place of the railroad company. His question was addressed to each of the three firms present, by its representatives; and it must have been understood as a call upon each to say whether *his* firm was ready to comply with such firm's part of the contracts. The identity of the iron was a point for Weld to answer. No one else could possibly have been able to answer it. It related to a matter necessarily outside of the personal knowledge of Flint and Gliddon, or either of them. 2. This meeting was held

because Robinson "had notified them, (*i. e.* all these three firms,) by letter from New York," to meet him. In his cross-examination he states that his inquiry about the iron was answered at this interview. The answer was, "that they had the iron on hand." He don't remember who made that answer. He knows that it was not Mr. Gliddon. That Weld did not give the answer, is a mere conjecture. *A.* "I feel sure that he did not, because the only answer he gave was the answer about which we quarreled. *Q.* He took no part in the conversation? *A.* I presume he did; but do not remember the particulars." Had a jury turned their back upon common sense, and from this evidence found a verdict that the carriers gave the answer, and, therefore, mulcted them in damages for fraud, would it not have been the duty of the court to set it aside as wholly without rational support. 3. The fair interpretation of the first conversation is that Weld's firm, through Mr. Weld, and the two defendant firms, on their parts, respectively, represented each its own ability to carry out its own contract, and not that either represented anything in relation to other. It was well nigh impossible that either could know anything about the ability of the other. And, certainly, there was no affectation of any such positive knowledge. 4. To create a liability for damages consequent upon representations alleged to be false, the plaintiff must show, 1st. That the representation was untrue. 2d. That the defendants knew it was untrue. (*Case* v. *Boughton,* 11 *Wend.* 108. *Williams* v. *Wood,* 14 *id.* 126. *Freeman* v. *Baker,* 5 *Barn. & Ad.* 797. 2 *Steph. N. P.* 1281.) 3d. That the defendants made the representation with intent to deceive. (*Young* v. *Covel,* 8 *I. R.* 23. *Addington* v. *Allen,* 11 *Wend.* 374. *Willink* v. *Vanderveer,* 1 *Barb.* 599. *White* v. *Merritt,* 7 *N. Y.* 352. *Zabriskie* v. *Smith,* 13 *id.* 322, 330. *Cazeaux* v. *Mali,* 25 *Barb.* 583, 584.) 4th. That the plaintiff acted in reliance on the defendant's representation, under circumstances in which he had a right to

rely thereon.   5th. That he was deceived thereby, and so induced to change his relation to the subject, to his damage.   5. There was an utter want of proof that the defendants knew, that the representation was untrue.   The plaintiff was in communication with Weld ; and for aught that appears, the defendants believed, as fully as the plaintiff could have believed, that Weld told the truth. (*Van Epps* v. *Harrison*, 5 *Hill*, 69, *and cases there cited. Davis* v. *Meeker*, 5 *I. R.* 354.)   (*a.*) The plaintiff being in personal communication with Weld for the very purpose of obtaining the information, Weld being the very person who had actual knowledge on the subject, the defendants would not be liable if Weld deceived the plaintiff; for there is no presumption that they were not also deceived.   (2 *Steph. N. P.* 1281, *and cases cited.*)   (*b.*) The defendants had reasonable ground for believing Weld's representation to be true; consequently, no action lay against them.   (*See McCracken* v. *Cholwell*, 4 *Seld.* 133.)   6. If Gliddon, at a period long subsequent to these transactions, did say it was not the same identical iron, the circumstances connected with that statement show that he neither admitted, nor was understood to admit, that he had any such knowledge when the original representation was made.   It was a just inference established by the prior evidence, that at the time of the Boston conferences in January, 1855, Weld was the sole originator of the supposed representation that it was the same identical iron; and there was nothing in the subsequent conversation to vary this.   7. It is settled law that a plaintiff should be nonsuited whenever the evidence is such that a verdict in his favor would be set aside on motion.   (*Rudd* v. *Davis*, 7 *Hill*, 529.   *People* v. *Cook*, 4 *Seld.* 70.   *Cox* v. *Hickman*, 8 *House of Lords Cases*, 299.)

VI. Even if the iron originally imported to comply with the order had been all sold to others, the company would not have thereby acquired, as the plaintiffs mistakenly suggest, a right to abandon the contract with Weld & Co.

Neither did any obligation rest upon Weld & Co. by force of their agreement, to have on hand in Boston in January, 1855, any rails whatever. 1. As before stated, the substance of Weld & Co.'s contract was to deliver rails in San Francisco. What is said about Wales has reference only to computations of interest and the acceleration of delivery in San Francisco. 2. The first lot, say 500 tons, was all at San Francisco before 20th November, 1854. The charges on this quantity, amounting to $19,000, were to have been reimbursed in cash, and the price of the iron paid by properly secured notes "on arrival." In January, 1855, the company was altogether in default. It had paid nothing; it had secured nothing; and it was not until Robinson's return to California in the summer of 1855, that any of these payments were made, or any of the iron received. 3. The business lay in this condition when Robinson visited Boston in January, 1855. It would have been most unreasonable to require that Weld & Co. should keep the identical rails of the other 1500 tons on hand in Boston all this time awaiting a resuscitation of this dormant company.

VII. If Weld & Co. were the defendants, the acceptance and use of the rails would bar the plaintiffs' action. (*Salisbury* v. *Stainer*, 19 *Wend.* 159. *Hargous* v. *Stone*, 5 *N. Y.* 73, 86, 87. *Sprague* v. *Blake*, 20 *Wend.* 61. *Howard* v. *Hoey*, 23 *id.* 352 to 354. *Hyland* v. *Sherman*, 2 *E. D. Smith*, 234. *Ely* v. *O'Leary*, *Id.* 355. *Warren* v. *Van Pelt*, 4 *id.* 202.)

VIII. The rulings in the course of the trial were unexceptionable. The exceptions should be overruled and the nonsuit affirmed.

*By the Court*, CARDOZO, J. The complaint was properly dismissed, in both aspects in which the cause of action was presented.

There was no warranty upon the part of these defend-

Robinson *v.* Flint.

ants as to the iron.  Their undertaking, in that respect, was to send to San Francisco iron lying in Boston or New York, and a suitable description, so as to identify it, was inserted in the contract.  If the article was not at the places from which they were to transport it, they could not send it, and the omission would be no breach on their part.  The language was simply descriptive, and did not constitute a warranty that the particular article existed.

· On the other branch of the case it is enough to say that there is not any evidence that these defendants knew the representation, if made by them, (which it is not necessary to determine,) to be false.  The very gist of the action for deceit is the fraudulent intent with which the representation is made; and that intent is not established by proof merely of the falsity of the representation; but knowledge when it was made, by the party making it, that it was false, must be shown.  (*Marsh* v. *Falker*, 40 *N. Y.* 562, *and cases cited.*)

There is no proof that these defendants, if they made the representations, did not believe them to be true.  The fact as to the identity of the iron was matter within the knowledge of Weld & Co.; and it is quite likely that whatevever information the defendants possessed was obtained from that firm.  And there is nothing to show that they did not believe, or had not the right to believe, in the truthfulness of the information they had acquired.

. I think the judgment should be affirmed, with costs.

Judgment affirmed.

[First Department, General Term, at New York, November 1, 1870. *Ingraham*, P. J., and *Geo. G. Barnard* and *Cardozo*, Justices.]